UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE DOE, an individual | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00381-SDN |
| | ) | |
| MISSIONARY OBLATES OF MARY | ) | |
| IMMACULATE EASTERN | ) | |
| PROVINCE et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

<u>INTRODUCTION</u>

Plaintiff Jane Doe[1] alleges priests of the Missionary Oblates of Mary Immaculate[2] sexually abused her when she visited Maine as a young child in the 1950s (ECF No. 39). In her complaint, Doe maintains that she suffers from severe mental and emotional injuries from the abuse. The Defendants now move for summary judgment in their favor, (ECF No. 74), to which Doe replies in opposition (ECF No. 78). For the reasons that follow, I grant Defendants' motion.

---

[1] Jane Doe is a pseudonym. *See* ECF Nos. 6, 10.

[2] In her first amended complaint, Doe names three related Oblates entities as defendants: Missionary Oblates of Mary Immaculate Eastern Province, Missionary Oblates of Mary Immaculate, Inc., and U.S. Province of the Missionary of Oblates of Mary Immaculate, Inc. Missionary Oblates of Mary Immaculate Eastern Province filed the instant motion; the same counsel represents all entities. For the sake of simplicity, I will refer to Missionary Oblates of Mary Immaculate Eastern Province and U.S. Province of the Missionary of Oblates of Mary Immaculate, Inc. individually and collectively as the Oblates. I will refer to Oblates of Mary Immaculate, Inc. as "OMI, Inc."

FACTUAL BACKGROUND

The following facts derive from the Defendants' Statement of Material Fact (ECF No. 74-1), Plaintiff's Response to Defendants' Statement of Material Fact (ECF No. 77), and Defendants' Reply to Plaintiff's Response (ECF No. 80), as well as the parties' briefs and other evidence that the parties reference in their statements of material facts to incorporate immaterial relevant information. *See* D. Me. Local R. 56.

A. The Missionary

The Oblates is a Roman Catholic religious missionary order that began its work in the United States in 1842.[3] The Eastern Province came into being in 1953 after a "realignment of the American provinces was made by the General Administration." ECF No. 77-3 at 4. The Eastern Province had seminaries in Newburgh and Essex, New York, Tewksbury, Massachusetts, and Washington, D.C. ECF No. 77, ¶ 27a. Oblates priests from the Eastern Province also served in Georgia, Massachusetts, New York, Pennsylvania, Michigan, and Washington, D.C. ECF No. 77, ¶ 27b. The Eastern and Northern Provinces were separate entities with separate administrative structures and authority. ECF No. 77, ¶ 27e. The Eastern Province did not own any of the retreat homes in Augusta, Bar Harbor, and Bucksport, Maine, where the Plaintiff's alleged sexual abuse occurred. ECF No. 77, ¶ 27d.

Relevant to the Plaintiff's claims are Reverends Arthur P. Craig (Rev. Craig) and Francis L. Demers (Rev. Demers), both of whom were involved with the Oblates during

---

[3] *See* ECF No. 77-3. Beginning in the 1950s, the Missionary Oblates consisted of various divisions that spread across the United States. ECF No. 74 at 2. The Eastern Province included Maine and Massachusetts and spanned across the nation to Michigan. ECF No. 78 at 2. The St. Jean Baptiste Province of Lowell became known as the Northern Province and it was established within the boundaries of the Eastern Province in 1991 *Id*. Since 1999, each of the various divisions are now combined into one national entity that covers the entire United States—OMI, Inc. *Id*.

the period in which Doe was in the custody of the orphanage, *see* ECF No. 74-6 at 10; ECF No. 77-11, but neither of which were assigned to the Northern or Eastern Provinces during said time period. Specifically, Doe claims that she now recalls Rev. Craig and Rev. Demers contributed to the alleged instances of sexual abuse that Doe experienced from the Oblates priests. ECF No. 39 at 4–6.

Rev. Craig attended the Eastern Province seminary in Washington, D.C. between 1951–1955, and he was ordained as a member of the Eastern Province in June, 1955. ECF No. 77, ¶¶ 17–18. In 1959, Rev. Craig was assigned to the serve as an assistant pastor at Immaculate Conception Church located in Lowell, Massachusetts. ECF No. 77, ¶ 20. Rev. Demers, who is now deceased, was a priest of the Northern Province—however, Doe did not name the Northern Province as a defendant in the complaint due to its subsumption into OMI, Inc. ECF No. 77, ¶¶ 34–35.

The Eastern province maintained personnel files for its members consisting of formation reports, approvals for vows and ordination, assignment history, assignment obediences, correspondence, and incident reports. ECF No. 77, ¶ 28. Rev. Craig did not have any such reports of misconduct of any kind, including sexual abuse, in his personnel file. ECF No. 77, ¶ 29-30. There also is no evidence suggesting that Rev. Demers had any such report in his personnel file.

Members of the Eastern and Northern Provinces were combined into a single entity after the formation and incorporation of the U.S. Province in 1998–1999. ECF No. 77, ¶ 31.

### B. Jane Doe

Doe was placed in the custody of St. Joseph's Orphanage in Fall River, Massachusetts, in 1955 at the age of four years old. ECF No. 74-1, ¶ 2. She remained in

custody of the orphanage for four years. *Id.* A French Canadian Roman Catholic Institution known as the "Grey Nuns" oversaw the orphanage. ECF No. 74-1, ¶ 3. For the purpose of analyzing Defendants' Motion for Summary Judgment, the Court assumes that the Grey Nuns interacted with Oblates priests at services, ceremonies, and retreats on multiple occasions, *see* ECF No. 77-6; however, the Oblates did not own, operate, or staff St. Joseph's Orphanage, ECF No. 74-1, ¶ 16.

Doe alleges that during her time at the orphanage, she would travel with the Grey Nuns and the Oblates across the region to sing and dance due to Doe's talents at such activities. ECF No. 74-1, ¶ 10. In furtherance of her allegations, Doe explains that the Grey Nuns and Oblates priests would transport Doe and other orphans, under the guise of scheduled religious performances, to the retreat homes in Augusta, Bucksport, and Bar Harbor, Maine, where the priests would perform sexual acts on the children. ECF No. 39. Doe claims an Oblates priest identified as Father Krzynski and varying Grey Nuns drove Doe and the other orphans to these offsite retreat homes in cars owned by the Oblates. ECF No. 74-3 at 76–77. Doe claims to have experienced this sexual abuse by the priests on at least ten separate occasions. *See* ECF No. 74-3 at 106.

While Doe always has been aware of the alleged abuse she encountered as a child, Doe actively repressed her memory of the specific acts of abuse throughout her adult life. *See* ECF No. 74-3 at, 11, 15, 148. However, "a 1994 episode of 60 Minutes triggered the experience to the foreground of her consciousness." ECF No. 78 at 5; ECF No. 74-3 at 11-12; ECF No. 74-1, ¶ 7. Following her recollection of the abuse, Doe wrote to Survivors Anonymous and was connected with another individual, Jane Doe DW,[4] who mentioned

---

[4] Jane Doe DW is a pseudonym. *Supra* note 1.

also being told about singing and dancing before being sexually abused by Oblates priests. ECF No. 74-1, ¶ 8-9; ECF No. 74-3 at 11–12, 15–16. After speaking with Doe DW, Doe did not seek to gain more information at that time as the "reopened wounds [were] too overwhelming." ECF No. 78 at 6; ECF No. 74-3 at 14–16. Furthermore, "like many victims of childhood sexual abuse," Doe disassociated from her memories of abuse due to feelings of shame and guilt. ECF No. 39, ¶ 30.

In 2020, Doe DW contacted Doe to testify on Doe DW's behalf. ECF No. 74-1, ¶ 11. Doe's own abuse by the priests then resurfaced. *Id.* ¶ 12; ECF No. 74-3 at 102–03. In 2022, Doe DW's attorney presented Doe with numerous photographs of "potential assailants that [Doe] 'recognized immediately.'" ECF No. 78 at 6; ECF No. 74-1, ¶ 13; ECF No. 74-3 at 102, ¶¶ 12–20. Doe now seeks recourse against the individuals and institutions that contributed to her sexual abuse while she was in the orphanage's custody. ECF No. 39, ¶ 31.

<u>DISCUSSION</u>

Summary judgment is appropriate when viewing all factual disputes in the light most favorable to the nonmoving party, no genuine issue of material fact exists that would prevent judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Montfort-Rodriguez v. Rey-Hernandez*, 504 F.3d 221, 224 (1st Cir. 2007). On a summary judgment motion, "[a] genuine dispute exists where 'a reasonable jury could resolve the dispute in favor of the nonmoving party.'" *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). Furthermore, "material" means a contested fact has the potential to change the outcome of the suit under the governing law. *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir. 2001). At summary judgment,

> there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose [her] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record."

*Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 689 (1st Cir. 2023) (quoting *Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)). The party opposing summary judgment "bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 87 (1st Cir. 2020) (quoting *Theidon v. Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020)). Because I am exercising diversity jurisdiction, I apply substantive Maine law to determine Doe's claims. *See Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 349 (1st Cir. 2018).

## A. Negligent Supervision

Doe claims the Oblates are liable for negligent supervision of the priests that allegedly took her to the retreat homes to sexually abuse her. ECF No. 39 at 15; ECF No. 78 at 18. Defendants contest the application of negligent supervision as an independent tort under Maine law, arguing the Law Court has not recognized such claims, and even if it had, no evidence of a special relationship between Doe and the Oblates exists, which is a requirement for negligent supervision claims to proceed. ECF No. 74 at 4.

Defendants further state the Eastern Province is the only Defendant that could be considered to have a special relationship with Doe with respect to Rev. Craig as he was the only priest assigned to the Eastern Province during Doe's tenure at the Orphanage. *Id.* at 5. However, Defendants argue the negligent supervision claim still falls short because the Eastern Province did not know nor had reason to know that Revs. Craig or Demers allegedly had a propensity for sexually abusing children. *Id.* at 6.

Maine's Law Court recognized the concept of negligent supervision in *Fortin v. Roman Catholic Bishop of Portland*. 2005 ME 57, ¶ 39, 871 A.2d 1208, 1222 (holding the relationship between Fortin and the Diocese was fiduciary in nature and sufficient to give rise to the special relationship the law requires for negligent supervision claims). "[I]f a plaintiff asserts the existence of facts that, if proven, establish a special relationship with a defendant in accordance with section 315(b) of the Restatement (Second) of Torts, an action may be maintained against the defendant for negligent supervision liability in accordance with section 317 of the Restatement." *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 16, 970 A.2d 310, 315 (quoting *Fortin*, 2005 ME 57, ¶ 39, 871 A.2d at 1222). Section 315(b) of the Restatement "provides that there is a duty to control the conduct of a third person to prevent [the person] from causing harm to another if 'a special relation exists between the actor and the other which gives to the other a right to protection.'" *Id.* (quoting Restatement (Second) of Torts § 315(b) (1965)). Section 317 of the Restatement (Second) of Torts provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or (ii) is using a chattel of the master, and
>
> (b) the master (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1965). Traditionally, there are four kinds of special relationships relevant to negligent supervision claims: (1) common carriers and their passengers; (2) innkeepers and their guests; (3) possessors of land and members of the

public who are their invitees; and (4) those who are required by law to take physical custody of another or who voluntarily do so, "such as to deprive the other of his normal opportunities for protection." Restatement (Second) of Torts § 314A. In *Fortin*, the plaintiff, who alleged his childhood priest had sexually abused him, filed suit against the Diocese for negligent supervision. *Fortin*, 2005 ME 57, ¶ 39, 871 A.2d at 1219. There, the Law Court expanded the scope of special relationships to include "those fiduciary relationships in which there exists a 'great disparity of position and influence between the parties' [that] would qualify as a 'special relation' pursuant to section 315(b)." *Dragomir*, 2009 ME 51, ¶ 16, 970 A.2d at 315 (quoting *Fortin*, 2005 ME 57, ¶ 34, 871 A.2d at 1222).

The Law Court explained Fortin's abuse began when he "was a parochial school student and altar boy" under the daily "supervision, control, and authority of the Diocese." *Fortin*, 2005 ME 57, ¶¶ 31, 34, 871 A.2d at 1219–20. The *Fortin* court followed the Second Circuit's analysis in *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 430 (2d Cir. 1999), where the Second Circuit held that because the *Martinelli* plaintiff was "a student at the diocesan school that employed the priest who committed the abuse," and "the Diocese knew the plaintiff had a 'special and privileged relationship' with the priest as a result of [the plaintiff's] membership in a small group of boys mentored by the priest," a special relationship existed. *Fortin*, 2005 ME 57, ¶ 33, 871 A.2d at 1220 (quoting *Martinelli*, 196 F.3d at 429). The *Fortin* Court found plaintiff's claims similarly established a special relationship between him and the Diocese as his fiduciary, and were sufficient to survive a motion to dismiss. *Id.* ¶ 34.

The Law Court recognizes custodial relationships as another type of special relationship that give rise to a duty for the purpose of negligent supervision claims. In *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, the Law Court declined to classify the

8

relationship between a plaintiff and his former camp counselor as custodial when the plaintiff was assaulted by the camp counselor after the end of the plaintiff's stay at the summer camp. 2011 ME 11, 11 A.3d 308. Recognizing that custodial relationships exist between "those who are required by law to take physical custody of another or who voluntarily do so, 'such as to deprive the other of his normal opportunities for protection,'" the Law Court found that, because the plaintiff was not deprived of her mother's protection while at the camp and the relevant parties left the camp two months before the assault occurred, no special relationship existed between the plaintiff and the camp. *Gniadek*, 2011 ME 11, ¶ 24, 11 A.3d at 315 (quoting *Dragomir*, 2009 ME 51, ¶ 19, 970 A.2d at 316).

The Law Court refrained from holding the relationship between Gniadek and the camp was fiduciary, because, as opposed to *Fortin*, the plaintiff in *Gniadek* only spent one week each year at the summer camp and did not maintain a relationship with the camp that differed from that of other campers. *Id.* ¶ 22. Moreover, the Law Court reasoned that the summer camp "did not exercise influence over [Gniadek] as the Diocese did in *Fortin*," and concluded that the camp's limited presence in the plaintiff's life "was not marked by 'a great disparity of power and influence between the parties.'" *Id.* ¶ 23 (quoting *Dragomir*, 2009 ME 51, ¶ 19, 970 A.2d at 316).

The inquiry into negligent supervision does not stop with a finding of a special relationship, however. The *Fortin* court explained the plaintiff's allegations established a special relationship between the then-child plaintiff and the Diocese as his fiduciary. Such a relationship then gave rise to the Diocese's duty to protect the child only if, "the Diocese knew or should have known of the risk of harm posed by the priest who abused Fortin." *Fortin*, 2005 ME 57, ¶ 38, 871 A.2d at 1222 (clarifying "[t]he duty does not exist simply

because of Fortin's status as a student and alter boy, but because of the added assertion that the Diocese knew or should have known of the risk of harm posed by the priest who abused Fortin"). The *Dragomir* Court further emphasized the "foreseeability" requirement for proof of a negligent supervision claim. *Dragomir*, 2009 ME at ¶ 23, 970 A.2d at 317 (explaining that a claim for negligent supervision "necessarily requires [the defendant] to have foreseen the need to control its employee").

In the instant case, Doe alleges that while in the custody of St. Joseph's Orphanage, Grey Nuns and an Oblates priest transported her to the retreat homes where Doe was sexually abused. Both parties stipulate the Oblates did not own, operate, or staff the orphanage, thus Doe could not have been under the daily supervision, control, or authority of the Oblates for the purpose of establishing a fiduciary relationship between the two. *See Fortin*, 2005 ME 57, ¶ 34, 871 A.2d at 1220. Nor could Doe be conceived to have a custodial relationship with the Oblates during her time at St. Joseph's as the Grey Nuns were Doe's sole caretakers and nothing in the record demonstrates the Oblates priests deprived her of the protection of Grey Nuns.

However, Doe alleges the Oblates were possessors of the retreat homes where Doe alleges her sexual abuse occurred, and Doe was invited to perform at these retreat homes by the Oblates. Analyzed under the summary judgment standard, these allegations allow the Court to conclude a special relationship between Doe and the Oblates exists classifiable as a possessor of land and their invitees pursuant to Restatement (Second) of Torts § 314A(3).

Nonetheless, Defendants' alternative argument that the Oblates did not know nor had reason to know of Revs. Craig or Demers' propensity for sexual abuse ultimately defeats Doe's claim. In contesting Defendants' argument on this point, Doe cites to

10

evidence demonstrating that a Reverend Real (Ray) Borque admitted to sexually abusing boys while working as director of St. Paul's Retreat House and Cursillo Center in Augusta, Maine in the 1970s. ECF No. 78 at 15. Even if the Court assumes, without concluding, that this piece of evidence could be admissible for some relevant limited purpose, no genuine issue of material fact exists that could demonstrate the Eastern Province was aware of any priests' propensity to sexually abuse children in the 1950s.[5] As a result, summary judgment for the negligent supervision claim is granted in favor of Defendants.

### B. Premises Liability

Defendants argue they also cannot be liable for Doe's sexual abuse under a theory of premises liability, because the retreat homes were owned by the civil corporation, OMI, Inc., and, as a civil corporation, OMI, Inc. did not exercise control of the Oblates who dwelled in the retreat homes. ECF No. 74 at 6-7. Doe maintains that, while OMI, Inc. was the owner of the retreat homes, the homes were utilized by priests of the Northern and Eastern Provinces that were subsumed by the incorporation of OMI. ECF No. 78 at 8–9. Similar to the previous argument, Doe also alleges the Oblates were aware of the sexual abuse occurring at the retreat homes due to previous reports made by the other minors alleging the Oblates priests sexually abused them. *Id.* As stated above, the evidence Doe presents on this claim relevant to Eastern Province contains reports made in the 1970s, nearly 15 years after Doe's time at the orphanage. *See* ECF No. 80, ¶ 4a.

Maine law imposes a duty on the owners of premises to protect its business invitees from reasonably foreseeable dangers. *Stanton v. Univ. of Maine Sys.*, 2001 ME 96, 773

---

[5] Doe cites to allegations of sexual abuse regarding Oblates priests Marcel Genereux and Eugene Turcotte. ECF No. 78 at 11. However, the evidence Doe cites demonstrates these allegations occurred outside the timeframe of Doe's tenure at St. Joseph's and/or outside the geographic territory of Maine or the Eastern Province. *Id.*; ECF No. 78 at 4. As such, these alleged facts are not sufficient to establish the foreseeability requirement necessary to succeed on a claim for negligent supervision.

A.2d 1045, 1049. Although the inquiry as to the existence of a duty is fact-intensive, whether a plaintiff is owed a duty of care is a matter of law. *Brown v. Delta Tau Delta*, 2015 ME 75, ¶ 9, 118 A.3d 789, 791. The court analyzes the facts pertaining to "foreseeability, control, and the relationship of the parties" to determine whether a duty founded on premises liability exists. *Id.* ¶ 14. In *Brown v. Delta Tau Delta*, the Law Court determined that a national organization exercised control and had a close relationship with its local chapter sufficient to establish premises liability where the national organization "provided [the local chapter's] name, credibility, corporate structure, and code of conduct. *Id.* ¶ 27. The *Brown* court also explained the potential for misconduct, including sexual assault, was foreseeable when the fraternity allowed "a group of eighteen-to-twenty-year-olds control over a residence where alcohol-related parties are held." *Id.* ¶ 15 ("A national fraternity knows, or should know, that social events carried on in a building that houses one of its local chapters presents the potential for sexual assault, particularly where alcohol consumption is an integral part of the event.").

In the present case, the record reveals that, as the successor entity of the Northern Province, OMI, Inc. was the owner of the home at 136 State Street in Augusta. Despite the fact that OMI, Inc. owned the home upon its incorporation, the Northern Province was the only entity to exercise control of the retreat home at the time of Doe's tenure at the orphanage and her alleged trips to the retreat home. *See* ECF Nos. 77-2, 77-3.

Regarding foreseeability, Doe's position is that all of the defendants were aware of sexual abuse occurring at the retreat homes due to the collection of reports she submits as evidence, *see* ECF No. 77-5, ¶ 4, and the risk of sexual assault at a boarding house for powerful men was foreseeable. ECF No. 78 at 11. Defendants reject this position, arguing

Doe's evidence that the alleged sexual abuse was foreseeable is insufficient to prove Doe's claim. ECF No. 74 at 7.

Doe presents no evidence that the Oblates or OMI, Inc. was aware of any of the priests' propensity for sexually abusing children at or around the time of Doe's tenure at the orphanage, and, unlike the foreseeability for misconduct at a fraternity house, the Cour does not find a corresponding general foreseeability regarding the Oblates and minor children. As such, Doe cannot survive summary judgment on a theory of premise liability.

### C. Vicarious Liability

Similar to the previous arguments, Defendants argue Maine does not recognize the application of vicarious liability in sexual assault claims because such conduct is outside the scope of employment. ECF No. 74 at 7. In response, Doe cites to *McLain v. Training and Development Corp.*, 572 A.2d 494 (Me. 1990), arguing that vicarious liability is applicable in cases where the servant purports to act on behalf of the principal and there is reliance upon apparent authority or the servant is aided in accomplishing the tort by the existence of the agency relationship. ECF No. 78 at 12.

Similarly, Doe distinguishes the instant case from *Mahar v. StoneWood Transport* where the Law Court, affirming the trial court's grant of summary judgment, held the defendant-employer was not liable for its employee's intentional tort when the employee left the company vehicle to assault motorists in a road rage incident. 2003 ME 63, 823 A.2d 540; ECF No. 78 at 12–13. Doe rests her argument on her claimed fact that here, as opposed to the critical finding in *Mahar* to the contrary, the existence of the priests' relationship with the Oblates did aid the employee's tortious conduct. ECF No. 78 at 12–13. Defendants properly contest Doe's interpretation of *Mahar*, arguing the claim failed

because the employer lacked prior knowledge of its employee's propensity for violence. ECF No. 74 at 8; *Mahar*, 2003 ME 63, ¶ 15, 823 A.2d at 545 (holding vicarious liability claims against employers for intentional torts require the agent's tortious act to be foreseeable).

As explained in the two previous sections, Doe presents no evidence demonstrating that Defendants were aware, or should have been aware, of any of their employees' alleged propensity for child sex abuse at or around Doe's tenure at the orphanage. In conclusion, Doe's vicarious liability claim is also cut by the scythe of summary judgment. *Baum-Holland*, 964 F.3d at 87.

### D. Intentional Infliction of Emotional Distress

Defendants contest Doe's intentional infliction of emotional distress claim with the same arguments against the Oblates' awareness of the sexual abuse occurring at the retreat homes. ECF No. 74 at 8-9. For the same reasons I state above, Doe presents no material evidence to dispel Defendants' arguments, and summary judgment is granted on the intentional infliction of emotional distress claim.

### CONCLUSION

For the reasons stated above, I grant Defendants' Motion for Summary Judgment in its entirety.

**SO ORDERED.**

Dated this 7th day of January, 2025

                                                         /s/ Stacey D Neumann
                                                U.S. DISTRICT JUDGE